LOTTINGER, Judge.
The basic facts of this case are as follows : By instrument effective as of September 20, 1961, plaintiff Gertrude Bou-terie, as Lessor, granted an oil, gas and mineral lease to defendant, T. W. Klein-peter, as Lessee, covering her undivided 1/5th interest in an 80 acre tract of land situated in Sections 45 and/or 103, T 15 S, R 16 E, and Sections 7 and/or 8, T 15 S, R 17 E, Lafourche Parish, Louisiana. The plaintiff Alma B. Leckert, as Lessor, also by instrument effective as of September 20, 1961, granted an oil, gas and mineral lease to defendant T. W. Kleinpeter, as Lessee, covering her undivided i/sth interest in the same 80 acre tract just described, and also a full lease in a 13 acre tract located in Sections 45 and/or 103, T 15 S, R 16 E, and Sections 7 and/or 8, T 15 S, R 17 E, Parish of Lafourche. The defendant David J. Robichaux, Jr. acquired his one-half interest in these leases by assignment from T. W. Kleinpeter. The leases were for a primary term of three years from September 20, 1961, and contained the additional clause “and so long thereafter as oil, gas or some other mineral is being produced or drilling operations are conducted either on this land or on acreage pooled therewith.”
While none of the leased land had wells located thereon, it appears that the land subject to the leases had been included in three units created by order of the Conservation Commission.
Plaintiffs claim their leases terminated as of September 1, 1965, because of defendants’ unreasonable delays in making royalty payments. By letter of December 9, 1964, plaintiffs made formal demand upon the defendants for timely monthly payment of royalty payments accruing under the leases, and concluded as follows: “Be assured that if the demand herein made for payment of Lessor’s royalty is not complied with we shall institute the necessary legal action to cancel the said leases.” Subsequent to that letter of December 9, 1964, the plaintiffs cashed all royalty checks sent to them through the month of August of 1965, or until September 1, 1965. No checks were cashed by them after that date. On December 29, 1966, plaintiffs, by registered letter, made formal demand upon the defendants pursuant to the provisions of LSA-R.S. 30:102, to execute and return to them an instrument acknowledging the termination of the leases. On March 8, *814 1967, plaintiffs filed their suit seeking the cancellation of the leases.
Both of the defendants testified that at no time during the period from August of 1965 to the date of the filing of the suit did they receive written notice from the plaintiffs as required by Paragraph 11 of the two lease agreements, and they filed a dilatory exception of prematurity based on that fact. Paragraph 11 of the leases reads as follows:
“11. In the event that Lessor at any time considers that operations are not being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the lease in force, shall have sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof.”
The defendants also alleged in their exception that the plaintiffs filed their suit even though royalty payments were being made regularly to them.
Trial of the exception of prematurity was held on February 6, 1968, at which time the defendants attempted to introduce evidence showing that the royalties were timely and properly paid under the subject leases. Plaintiffs objected to the introduction of any such evidence on the grounds that it was immaterial to the hearing on the question of prematurity; that the issue raised in plaintiffs’ petition, that is, whether or not the royalty payments were timely made, was the subject for the merits of the case and had no bearing on the question of the necessity of giving notice, which was the basis of the exception of prematurity. The Trial Court ruled to accept evidence on whether or not plaintiffs had given the defendants proper notice and plaintiffs applied for supervisory writs to this Court under our docket No. 7451, which writs were refused on February 20, 1968. Plaintiffs then applied to the Supreme Court of Louisiana for supervisory writs under its docket No. 49,147, 251 La. 1039, 208 So.2d 320. The application was denied on March 25, 1968.
Following the refusal of the Supreme Court to grant writs, the trial of defendants’ exception of prematurity was heard on June 25, 1968, and for writtten reasons assigned, judgment was rendered, read and signed on March 10, 1969, sustaining defendants’ dilatory exception of prematurity and dismissing plaintiffs’ suit at their costs, from which judgment plaintiffs have appealed.
The main question involved here is whether or not the provisions of Paragraph 11 of the lease agreements in question have application to the facts of this case, and, if so, whether plaintiffs complied with the provisions of Paragraph 11.
The learned Trial Judge in his excellent reasons for judgment pointed out that in the case of Bollinger v. Republic Petroleum Corporation, La.App., 194 So.2d 139, application den. 250 La. 463, 196 So.2d 276, this Court held that a requirement of notice to the lessee and a thirty day waiting period was a valid and binding condition precedent to the institution of suit for cancellation of a lease. He then went on to hold that it is lawful for parties to enter into agreements such as set forth in Paragraph 11 of the leases in question herein and that these agreements are binding on the parties.
In Bollinger, supra, 194 So.2d at page 141, the lease terms relied on provide as follows:
“(9) In the event Lessor considers that Lessee has failed to comply with one or more of its obligations hereunder, either expressed or implied, Lessor shall notify Lessee in writing setting out specifically in what respects Lessor claims Lessee has breached this lease. The service of such notice and the lapse of thirty (30) days without Lessee’s meeting or commencing to meet the alleged breaches *815 shall be a condition precedent to such action by Lessor on this lease. If within thirty (30) days after receipt of such notice Lessee shall meet or commence to meet the breaches alleged by Lessor, Lessee shall not be deemed in default hereunder. Neither the doing by Lessee of any acts claimed to meet all or any of the alleged breaches, nor its failure so to act, shall be deemed an admission or presumption that Lessee has failed to perform any of its obligations hereunder.”
In interpreting that lease provision, this Court held as follows, to-wit:
“We find that the requirement of notice to the lessee and the thirty day waiting period is a valid and binding condition precedent to institution of suit for cancellation of the lease in question. It is our opinion that if plaintiff, as lessor, considered and determined to his own satisfaction that the defendant, as lessee, was not complying with any condition or provision of the lease agreement, he, the plaintiff, should have complied with the requirements of paragraph (9) quoted supra. This the plaintiff failed to do; therefore, his demands must be rejected;” -
It is therefore clear that under the authority of the Bollinger case, such provisions as contained in Paragraph 11 of the leases herein are legal and binding. However, plaintiffs strongly urge that Paragraph 11 has no application here because the word “operations” as used in that paragraph applies only to the drilling or reworking of wells and does not apply to such obligations as the payment of rentals or royalties. Plaintiffs then go on to distinguish the applicable lease provision in the Bollinger case from the applicable lease provision in this case, that is, Paragraph 11.
In interpreting Paragraph 11 and its application to the present case, the Trial Court held as follows:
“To resolve the dispute between the parties, this Court must first determine if the provisions of Paragraph 11 of the lease agreements have application to the facts in this case. In Bollinger v. Republic Petroleum Corp., La.App., 194 So. 2d 139, the First Circuit Court of Appeals found that a requirement of notice to the lessee and a thirty day waiting period was a valid and binding condition precedent to the institution of suit for cancellation of a lease. Thus, it appears that it is lawful for parties to enter into agreements such as that set forth in Paragraph 11, and these agreements are binding on the parties. The Supreme Court of Louisiana denied writs in the Bollinger case with the notation that the ‘judgment of the Court of Appeal is correct.’ Bollinger v. Republic Petroleum Corp., 250 La. 463, 196 So.2d 276.
“The plaintiffs contend that Paragraph 11 does not apply in this case because the word operations used therein applies only to the drilling or reworking of the wells. In reply to this the defendants point out at page four of their rebuttal memorandum:
“ ‘In order to determine the meaning of the word “operations” we must look to the Louisiana Revised Civil Code for guidance. Article 1946 entitled “Common meaning of words” in the section on Interpretation of Agreements provides:
“ ‘ “ The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use.” ’
“ ‘Black’s Law Dictionary defines “operation” as “Exertion of power; the process of operating or mode of action; an effect brought about in accordance with a definite plan; action; activity.” In this regard is not the production of oil and gas, its sale and/or conversion into cash and distribution in the form of payments of *816 royalties an “action”. It is most certainly “an effect brought about in accordance with a definite plan”.
“ ‘Volume 29 of Words and Phrases defines “operation” in the following manner:
“ ‘Operation’ is doing some act or performance of some type of service, work, deed, production, creation, product of work. Waterman S. S. Corp. v. Snow, D.C., 222 F.Supp. 892, 897. An ‘operation’ is an action or activity and is the action of making or producing something. Com. v. Sitkin’s Junk Co., 412 Pa. 132, 194 A.2d 199, 203.” ’
“Further, Webster’s Seventh New Collegiate Dictionary defines ‘operate’ as ‘to perform a work or labor’; and ‘to produce an appropirate effect’ and defines ‘operation’ as ‘a doing or performing of a practical work or of something involving practical application of principles or processes’ and ‘a business transaction esp. when speculative.’
“It thus appears that the word operations as generally and popularly used means the process of operating or mode of action, an effect brought about in accordance with a definite plan, is the action of making or producing something, and is a business transaction involving practical application of principles or processes. The production of minerals from the leased premises, its piping and sale and distribution of the funds derived from the sale are operations, and therefore, Paragraph 11 of the leases is applicable.”
In rebuttal of plaintiffs’ contention that Paragraph 11 of the leases does not apply because the word “operations” as used therein applies only to drilling or reworking wells, the defendants quote Paragraph 7 of the said leases which provides as follows:
“7. Subject to the provisions of Paragraphs 2 and 10 hereof the royalties to be paid by Lessee are: (a) On oil and other liquid hydrocarbons one-fourth
(J4th) of that produced and saved from the land and not used for fuel in conducting operations on the property (or on acreage pooled therewith) or in treating said oil to make it marketable; (b) one-fourth 04th) of the market value of the gas sold or used by Lessee in operations not connected with the land leased or any pooled unit containing a portion of said land; (c) one-fourth 04th) of the value at the mouth of the well of casinghead gas used in manufacturing casinghead gasoline to be computed by methods recognized in the industry; (d) Two Dollars ($2.00) for each ton of 2240 pounds of sulphur, payable when marketed; and (c) one-fourth 04th) of the value of all other minerals mined and marketed. Oil royalties shall be delivered to Lessor free of expense at Lessor’s option in tanks furnished by Lessor at the well or to Lessor’s credit in any pipe line connected therewith. In the event Lessor does not furnish tanks for such royalty oil and no pipe line is connected with the well, Lessee may sell Lessor’s royalty oil at the best market price obtainable and pay Lessor the price received f. o. b. the leased property, less any severance or production tax imposed thereon.
“Lessee shall have the right to inject gas, water, brine or other fluids into sub-surface strata, and no royalties shall be due on any gas produced by Lessee and injected into sub-surface strata through a well or wells located either on the land or on a unit comprising a portion of the land.”
Defendants then point out that with reference to gas royalties, Lessee must give to Lessor 14th of “the market value of the gas sold or used by Lessee in operations not connected with the land leased or any pooled unit containing a portion of the land” and with regard to oil and other liquid hydrocarbons, “14th of that produced and saved from the land and not used for fuel in conducting operations on the property”, thus arguing that an in *817 tegral part of the exploration, production, possession, ownership, and transportation of the minerals discovered under the leased land is their sale and conversion into cash for the payment of royalties, and that the production of minerals, their sale and payment of royalties are all “operations” conducted under the lease; that by the very terms of the leases the word “operations” is used in this regard.
Also, it would appear from an examination of the leases that the analysis made by the Trial Judge is correct and that the term “operations” as used in Paragraph 11 should be used in a broad sense and not in the narrow sense argued by the plaintiffs, and, therefore, it would be necessary for the plaintiffs to give the defendants 60 days written notice as required by Paragraph 11.
Having determined that the requirements of Paragraph 11 of the leases must be met, the Trial Judge turned to the second question at issue, that is, did the plaintiffs comply with the requirements of said Paragraph 11. He pointed out that plaintiffs offered into evidence two letters, one dated December 9, 1964, and the other December 29, 1966, both of which are referred to above, and which were introduced over the objections of the defendants. He ruled that the letter of December 29, 1966, was clearly inapplicable as it was sent pursuant to LSA-R.S. 30:102, and plaintiffs do not even argue that it was sent in accordance with Paragraph 11 of the leases. At the time of the trial of this issue, attorneys for plaintiffs acknowledged that the letter of December 9, 1964, “was not sent pursuant to Paragraph Eleven of either of the leases because we consider Paragraph Eleven completely immaterial to the cause of action sued upon here.” The Trial Judge pointed out that the plaintiffs subsequently argued that the letter of December 9, 1964, was sent pursuant to Paragraph 11, but the Court felt they were bound by the acknowledgment of their attorney and that therefore the letter of December 9, 1964, was inapplicable.
Even if it could be held that the letter of December 9, 1964, was applicable, the record shows that defendants made royalty payments to plaintiffs on December 22, 1964, December 30, 1964, January 7, 1965, and February 5, 1965, all within the sixty day period after December 9, 1964. The plaintiffs accepted the payments and cashed the checks and continued to accept and cash royalty checks until September 1, 1965. It would, therefore, have to be assumed that the defendants had complied with plaintiffs’ demands during the sixty day period.
The Trial Court went on to hold that there was no evidence in the record to show compliance with Paragraph 11 during the period from September 1, 1965, when the last royalty checks were cashed, until March 8, 1967, the date the suit was filed, and accordingly, it was the holding of the Trial Court that “the petition of the plaintiffs is premature because they failed to comply with a valid condition precedent of the lease agreement.”
Plaintiffs strongly urge that the interpretation of the word “operation” in Paragraph 11 only applies in the notice of default provision of the lease and is restricted to physical drilling or reworking operations on the lease, and that the lease provision requiring lessor to give lessee sixty days notice of breach for failure to perform required operations applies only to operations during the primary term of the lease. In support of their contention they cite Producers Oil & Gas Co., Inc. v. Continental Securities Corporation, 188 La. 564, 177 So. 668 (1937) ; Taylor v. Kimbell, 219 La. 731, 54 So.2d 1 (1951); Sittig v. Dalton, 195 La. 765, 197 So. 423 (1940); Logan v. Blaxton, 71 So.2d 675 (La.App. 2nd Cir., 1954); Taylor v. Buttram, 111 So.2d 576 (La.App. 2nd Cir., 1959); and House v. Tidewater Oil Company, 219 So. 2d 616 (La.App. 3rd Cir., 1969).
An examination of all of those cases discloses that the situation in each was not the same as in the case at issue herein. In those cases the primary term of the *818 lease had ceased without operations, or the production involved had ceased and the leases had not been reworked. In none of those cases did they have a situation where the leases were in a producing unit which was producing at the time of the alleged breach.
In the Producers case, supra, the question involved was an interpretation of a clause which held that the primary term would expire at the end of five years if oil and gas was not being produced on said land, but if at that time the lessee was engaged in drilling or reworking operations thereon, the lease would remain in force so long as operations were prosecuted with no cessation for more than 30 consecutive days, and if the drilling or reworking operations resulted in the production of oil or gas the lease would remain in force. However, the reason why the drilling which the lessee was engaged in at the expiration of the primary term of the lease did not continue the lease in force up to the date when the suit was filed on January 18, 1937, was that the drilling operations had ceased on November 26, 1936, and hence there was a “cessation for more than 30 consecutive days” before the suit was filed. The Court held that under those circumstances the 60-day notice in question would not have any effect, it being clear that the lease by its very terms had come to an end and there would be no requirement for notice.
In other words, in all of those cited cases the primary term of the lease had ceased due to either (1) the failure to produce oil, or (2) there was a failure in the production to meet commercial standards and there had not been reworking operations done within the time limit of the lease.
Another argument strongly urged by plaintiffs is to the effect that written demand sent to and received by the lessee constituted a formal putting into default pursuant to Louisiana Civil Code Article 1911. With this argument we are in agreement. However, what is at issue herein is the interpretation of a specific clause of the lease, and in this situation the specific clause would control over the question of putting in default. Whether or not the plaintiffs had properly put defendants in default in accordance with LSA-C.C. 1911 is superfluous in this issue.
An additional argument urged by plaintiffs is that the defendants have blocked their plea of prematurity by alleging they had regularly paid the royalty payments. They cite Wadkins v. Wilson Oil Corp., 199 La. 656, 6 So.2d 720 (1942), and Louisiana Farms Co. v. Yazoo & N. V. R. Co., 179 La. 539, 154 So. 445 (1934). The issue in both of those cases was whether or not there was a demand for performance of the contract pursuant to Civil Code Article 1911 — the method of putting in default. Here again, we are not concerned with that article. We are dealing with a stated requirement or clause set out in the lease which, if held applicable as herein, has no relationship to the Civil Code article relating to putting in default. It is the opinion of this Court that neither of these cited cases is applicable herein.
It should be pointed out that in the Bollinger case this Court held that the Louisiana Farms Co. case, supra, upon which the Wadkins case, supra, was based, was not apropos to the Bollinger case; that the cases were clearly distinguishable on the facts because in the Louisiana Farms case the verbal contract between the parties contained no condition precedent to filing suit for the giving of notice of demand for the performance of an obligation, and in the absence of a provision for notice, Civil Code Article 1911 was correctly invoked as determinative of the question. We feel that this reasoning would also apply to the Wadkins case.
Plaintiffs also attempt to show that the reasonings of Justice Fournet in the case of Vance v. Hurley, 215 La. 805, 41 So.2d 724, one of the cases relied upon in the Bollinger case, are mere dicta, but an *819 examination of that case does not lead this Court to that conclusion.
We find nothing in the plaintiffs’ brief which would indicate to this Court that the decision of the Trial Court in this matter is erroneous and we are, therefore, of the opinion that the judgment of the Trial Court should be affirmed.
For the above and foregoing reasons the judgment of the Lower Court is affirmed, all costs, including the cost of this appeal, to be borne by the appellants.
Judgment affirmed.